# Wheeling.

## CHARLES WINTERNITZ & SON *vs.* JACOB HYLAND AND G. W. RAMER.

### January Term, 1869.

1. It is competent to establish by evidence *in pais* whether the people of a county not specifically mentioned in the President's proclamation of August 16th, 1861, declaring certain States and parts of States in insurrection, maintained a loyal adhesion to the constitution and Union.

2. The people of the county of Berkeley maintained a loyal adhesion to the constitution and Union at the date of the proclamation of August 16th, 1861, and were, therefore, excepted from the operation thereof as against parties in insurrection and rebellion, and were inhibited from commercial intercourse with parties engaged therein as public enemies of the United States.

3. It does not matter that at the time of the sale of the goods in this case, which was made in Berkeley county in September, 1861, that the rebel authorities were in military control and possession of the territory of the same.

The declaration in this case was filed at December rules, 1867, in the clerk's office of the circuit court of Berkeley county, by Charles Winternitz & Son, against Jacob Hyland and George W. Ramer. The action was covenant, and the paper sued out was in the following words:

"This article of agreement, made this 21st day of September, 1861, between Charles Winternitz & Son, of the first part, and Jacob Highland, of the second part, witnesseth: that the parties of the first part have this day sold to the parties of the second part their entire stock of goods,—coats, pants, vestings, boots, shoes, &c.

"The conditions of the above sale are as follows: The said stock of goods is to be moved from this place (Martinsburg) to Richmond, at the exclusive cost of the party of the second part; upon the arrival of the goods in the city of

Richmond, if the goods come up to the statement as represented by the bill of said goods, the party of the second part, with George Ramer, of the county of Berkeley, as security, was himself to pay the amount for which the bill calls for, *i. e.*, the Baltimore cost of said goods, except the boots and shoes, for which the party of the second part is to pay ten per cent. above cost.

"Witness the following signatures and seals, the day and year first above written.

"JACOB HYLAND,      [seal.]

"GEORGE W. RAMER.      [seal.]"

The declaration alleged the sale and delivery of the goods, and that the value of the same was 2,241 dollars and 43 cents. The defendant, Ramer, who was surety for Hyland, pleaded that at the time of the sale and contract a civil war existed between the United States and the people of certain States styling themselves the Confederate States of America, and that prior to the contract and sale, in pursuance of the law of nations and an act of Congress passed July 13th, 1861, the President of the United States had issued a proclamation, declaring the State of Virginia, except the inhabitants of that part of the State lying west of the Allegheny mountains, and of such other parts thereof as maintained a loyal adhesion to the Union and constitution, to be in a state of insurrection, and that all commercial intercourse between the same and the inhabitants thereof, with the exceptions mentioned, should be deemed unlawful; and that the plaintiffs having full notice of the proclamation, with the intent to violate the law and frustrate the policy of the government in suppressing the insurrection, sold the goods mentioned in the agreement, with the agreement and express understanding that they were to be taken from Martinsburg, in the county of Berkeley, which county was at the date of the proclamation a county maintaining a loyal adhesion to the Union and constitution, to Richmond, in the State of Virginia, to be sold and disposed of for the use and benefit of the inhabitants thereof who were in insurrection against the government of the United States;

and that the said contract was totally null and void as being made in violation of the law of Congress and the proclamation of the President made in pursuance thereof, and against public policy.

The plaintiffs replied specially that, at the time of the sale, they were residents of Martinsburg; that the proclamation did declare, &c., as alleged in the plea. That by virtue of the proclamation the town of Martinsburg, and the county of Berkeley, were in insurrection against the government of the United States, and were then not occupied or controlled by the forces of the United States. That the goods were sold and delivered in the town and county mentioned, and that they were transported to Richmond. That the plaintiffs were wholly ignorant of the purposes to which the goods were to be used and applied; that the city of Richmond and all the country between there and the town of Martinsburg, were at date of sale and delivery, in a state of insurrection, and was not then occupied or controlled by the military forces of the United States, and that it was lawful to sell the goods at the time and in the manner they did so. That at the time of the sale the county of Berkeley, the town of Martinsburg, and all the territory and country betweeen there and Richmond, were within the military lines and control of the rebel authorities and not, by operation of law or the proclamation, excepted from the States and parts thereof in insurrection and rebellion.

To this special replication defendant Ramer rejoined, that at the time of the sale, the county of Berkeley was maintaining a loyal adhesion to the Union and Constitution, and that the goods were sold in violation of law, the proclamation of the President, and public policy.

A trial was had in May, 1868, and verdict for the defendant.

On the trial the plaintiff offered in evidence the covenant, and the evidence of sundry witnesses to prove the sale, and the occupancy of the county of Berkeley at the date thereof by the rebel forces; that the goods were delivered to Hyland and taken to Richmond; that the rebels were in

possession of the country from Martinsburg to Richmond at the date of sale and within the rebel lines at all times from the sale until they arrived at the last named place. He also introduced the proclamations of the President of August, 1861, and first of January, 1863.

The defendant thereupon offered to prove, as a matter of fact, that the citizens of Martinsburg and of Berkeley county were, at the date of the President's proclamation of August 16th, 1861, and at the date of the sale, maintaining such loyal adhesion to the Constitution and Union as was contemplated in the proclamation, and as exempted and excepted Berkeley county from States and parts of States declared to be in rebellion. To the introduction of this testimony the plaintiffs objected, but the court overruling them, they excepted. The defendant then, by permission of the court, introduced other witnesses, who proved that, on the 16th of August, 1861, and before and after that time, a large majority of the inhabitants of Berkeley county were Union men in sentiment and in favor of maintaining the authority of the government of the United States, and in the opinion of the witnesses the inhabitants of the county maintained a loyal adhesion to the Constitution and Union at the time of the proclamation. To which the plaintiffs excepted. It was also proven that courts were held in the county by justices who recognized the authority of the rebel government during the months of August and September, 1861.

The plaintiffs moved for a new trial upon the ground of the admission of the testimony of the defendant, which the court refused, and plaintiffs again excepted.

*Stanton & Allison* for the plaintiffs in error.

This was an action of covenant for a contract under seal for the price of certain goods sold by the plaintiffs to defendant Hyland, the defendant Ramer binding himself as security for the payment of the money. The defendant pleaded in substance that the goods were sold to public enemies in violation of public policy and the act of July 13th, 1861, and the President's proclamation of August 14th,

1861. To this the plaintiffs replied specially, that the goods were sold at Martinsburg to be transported from thence to Richmond, and that Martinsburg and Richmond were both in insurrection against the government of the United States, and were both within the lines of the rebel army. The defendant rejoined that at the time, the town of Martinsburg, and the county of Berkeley, maintained a loyal adhesion to the government of the United States, upon which issue was joined.

Thus it will be seen that the pleading resulted in an issue as to the legal status of the town of Martinsburg at the time of the sale. This the defendants endeavored to maintain by parol evidence, that before, at the time, and after the said goods were sold, a large majority of the inhabitants of Berkeley county were Union men; to which the plaintiffs objected, but the evidence was allowed and a verdict found for the defendants.

The facts proved upon the trial are all in the record, and the whole merits of the case are involved in the motion for a new trial.

It appears that from or about the 1st of August, 1861, to March, 1862, the town of Martinsburg, and the county of Berkeley, were within the lines of the rebel army, and that the courts and civil officers held under and recognized the authority of the rebel government.

The covenant on which the suit is brought is dated September 1st, 1861. It is claimed by the appellants that the legal status of the county of Berkeley and the town of Martinsburg was not matter *in pais* to be proved by parol and determined by the jury. Whether a State, or any particular part of a State, is in insurrection or not, is a matter to be determined by the political departments of the government, and the court must follow that decision. When a State, or a part of a State, is once declared to be in insurrection by the executive or legislative department of the government, it remains in insurrection until its status is changed by the same power. The President's proclamation declares, "that the State of Virginia, except that part lying

west of Allegheny mountains and such other parts as may maintain a loyal adhesion to the Constitution and Union," are in insurrection. 12 Statutes at Large, 1262. Upon the face of the proclamation the county of Berkeley and the town of Martinsburg not being in that part of the State of Virginia lying west of the Allegheny mountains, was declared to be in insurrection. This could only be repelled by showing that the county of Berkeley maintained a loyal adhesion to the Constitution and Union at the time the cause of action arose, and this could only be done by some act of the executive or legislative department of the government, declaring its status. *United States* vs. 129 *Packages,* Am. Law Reg., N. S., vol. 2, No. 7, p. 428. In that case it was held, "that when the President has proclaimed a State to be in insurrection, the courts must hold that this condition continues until he decides the contrary. The same rule applies as to the exceptions from the interdict of such parts of the insurrectionary States as may maintain a loyal adhesion to the Union and the Constitution, or may be from time to time occupied and controlled by the forces of the United States engaged in the dispersion of the insurgents, such exceptions and the legal status of such parts of said States are to be determined by the President." This case was decided by the district court of the United States for the district of Missouri, in September, 1862. Independent of the weight which is due to the decision of the court as an authority, the able an elaborate opinion of the court cannot fail to commend itself to the favorable consideration of this court. This conclusion necessarily results from the proposition that the war making power belongs to the political department of the government. The courts cannot make war or peace. This has been settled so often by the courts of the United States and this State, that we need not refer to authorities in support of it.

*Hedges* vs. *Price,* 2 West Va. Rep., and the cases there cited, leave no room for controversy on this subject in this court.

And whether any given portion of the territory of any

State is in insurrection or not is not a question of fact to be found by a jury and decided by the court, it must always be a question as to the legal status of such territory, which must be settled by the war making power.

There is another answer to the defense which is equally conclusive. It is unlawful to trade with territory in possession of an enemy. Halleck's Int. Law, 511, sec. 20. "The same rule applies to revolted territory or a colony of the enemy. Courts of justice always regard such revolted territory as belonging to the enemy, until by some public act of their own government it is expressly recognized as an independent and friendly power."

The record in this case shows that the place where this cause of action arose was, at the time, within the rebel lines, and that the courts and authorities of the county recognized the sovereignty and supremacy of the rebel government.

We suppose it can hardly be claimed that if trade with loyal territory was unlawful that trade with rebel territory was also unlawful. If trade between Martinsburg and Baltimore was unlawful at the time the cause of action arose, because one was in insurrection and the other was not, and because one was within the rebel lines and the other within the Union lines, it seems to us that trade between Martinsburg and Richmond must be lawful, because both were within the rebel lines. It can hardly be claimed that all trade between rebels and within rebel territory was unlawful. Was trade between Richmond and Petersburg unlawful? If a man bought a coat or a barrel of flour in Richmond during the war, will not the courts make him pay for it now the war is over? If so, then trade between Martinsburg and Richmond was lawful at the time this cause of action accrued. It must be borne in mind that these goods were not sold to any officer or agent of the rebel government, nor for the use of the rebel government; they were goods for the consumption of the non combatant population of the rebel States. Certainly no recovery could be had for supplies furnished to the rebel armies, nor are we

responsible for the ultimate destination of these goods. They were not contraband goods.    Arms, and other warlike implements, are contraband of war, and dealing in such contraband; is unlawful so supplies to the army are contraband, because they are to be used for an unlawful purpose. But food and clothing, and articles that are common to non combatants and combatants alike, are not contraband, unless they are furnished as supplies to combatants; or if they are furnished by one belligerent to another the trade is unlawful, because it adds to the resources and supplies of the enemy.    But the reason for the rule wholly fails when both of the parties to the contract belong to one of the belligerents, and the commodities sold are as much under his control in the hands of the seller as in the hands of the buyer.    Goods could not be sold and sent from Baltimore to Richmond during the war, because it placed additional resources under the control of the rebel government.    But goods in Martinsburg, in September, 1861, were just as much under the control of the rebel government as if they had been in Richmond.    The sale and shipment of goods from Martinsburg to Richmond added nothing to the resources of the rebel government, and therefore such sale and shipment was not illegal.

One of the consequences of trade with an enemy is, that the goods which are the subject of the illegal traffic are subject to capture and condemnation.    But this property was never subject to capture because it was never in loyal territory, and never within the power or under the control of the government of the United States, and "it is repugnant to every idea of a proceeding in *rem* to act against a thing which is not in the power of the sovereign under whose authority the court proceeds."    *Rose* vs. *Himely*, 4 Cranch, 277.    This property was never in a situation to be subject to condemnation by reason of the manner in which the owner dealt with it.    Certainly if the armies of the United States had found this property either at Martinsburg or Richmond, either before or after it was sold by the plaintiffs to the defendant, it might have been taken as enemy's

property for army supplies.  But not because it had been sold by the plaintiffs to the defendant and shipped from Martins-burg to Richmond.  The precise issue in the case was whether the town of Martinsburg was in insurrection at the time the cause of action accrued.  We submit upon the authorities already referred to that it has been declared in insurrection by the President's proclamation, and could not claim to come within the exception of territory maintaining a loyal adhesion to the Union until it was specifically declared to be so by some subsequent proclamation.  But if this were not so certainly its status could not be determined by an inquiry into the opinion of a majority of its inhabitants. If · it was in the power and under the control of the rebel armies, and its courts and officers sustained the authority of the rebel government, certainly it cannot be claimed that they maintained a loyal adhesion to the Constitution and the Union.

*Charles J. Faulkner* for the defendants in error.

The contract made on the 21st of September, 1861, between the appellants and appellees was void, and no action can be maintained upon it.  By the terms of that contract, the goods referred to in it consisted of coats, boots, shoes, &c., were to be conveyed from Martinsburg to the city of Richmond, and to be paid for upon their arrival in that city.

1st. The contract is void upon principles of international law.

In the early part of the year 1861, the States of South Carolina, Mississippi, Alabama, Louisiana, and other Southern States had declared their withdrawal from the Union, and were preparing to maintain their declaration by arms. The President saw very clearly that war was inevitable. and that one of the most effectual modes of conducting a war on behalf of the national government to a successful issue, was to arrest at the earliest moment possible, the introduction of supplies of all kinds into the insurrectionary States.  He accordingly, on the 19th of April, 1861, issued

his proclamation declaring the ports in the States of South Carolina, Georgia, Alabama, Florida, Mississippi, Louisana and Texas to be subject to blockade, and on the 27th of April, 1861, further extended this proclamation to the ports of Virginia and North Carolina, and due notice of this blockade was given to all foreign nations with whom we had maratime relations.      This was perhaps as far as the constitution enabled the President to move in arresting commercial intercourse with the insurrectionary States. On the 4th of July, Congress was convened, and on the 13th of that month a law was passed authorizing the President, by proclamation, to declare the inhabitants of certain States in a state of insurrection, and thereupon all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostility shall continue.      Such a proclamation was issued by the President in pursuance of that law of Congress, on the 16th of August, 1861.

It is a fact of general history, and also declared by the highest judicial authority, that at the date of this contract, a civil war existed between the people and government of the United States and the people of certain insurrectionary States in the South, styling themselves the Confederate States of America, and that Richmond, in Virginia, was at that time the capital of this insurgent government, and the centre of its military operations.

One of the immediate consequences of a state of war is the absolute interruption and interdiction of all commercial intercourse and dealing between individuals of the belligerents.

It follows that all contracts of sale made with or for the use of the enemy are utterly void.      The remission of funds to subjects of the enemy is unlawful.      The inhibition reaches to every communication, direct or circuitous, and no artifice has succeeded to legalize the trade without the express permission of the government.      Its necessary tendency is to cherish the resources and relieve the wants of the enemy.

Every relaxation of the rule tends to corrupt the allegiance of the subject and prevents the war from fulfilling its end. This is the doctrine of all the authoritative writers on the law of nations. It is equally the received law of this country, and has been so decided frequently by the supreme court of the United States, and it is difficult to conceive, says Chancellor Kent, 1 vol. Com., p. 67, of a point of doctrine more deeply and extensively rooted in the national law of Europe, and in the universal and immemorial usage of the whole community of the civilized world. Wheaton on International Law, p. 544; Halleck on International Law, p. 498.

Although there be no special interdiction, commerce is forbidden by the mere operation of the law of war. *Ib.*, p., 544. Whatever relaxation of the strict rights of war, the more mitigated and mild practice of modern times might have established, there had been none on this subject. The universal sense of nations had acknowledged the demoralizing effects which would result from the admission of individual intercourse in time of war. The whole nation is embarked in one common bottom, and must be reconciled to one common fate. By the law of nations, a hostile character is attached to trade independent of the character of the trader who pursues or directs it. 8 Cranch, p. 115.

2d. The contract was void as made in violation of public policy.

It is manifest, after the date of the President's proclamation of blockade and non intercourse, that all contracts made with intent to furnish those who were engaged in the insurrection with supplies calculated to increase their efficiency as soldiers, and to protract hostilities, were necessarily in violation of the declared policy of the government, even if the transaction did not bring the offending parties within the penal provisions of the statute and proclamation. This policy, being the declared policy of the sovereign power, was obligatory upon every person within the limits of the United States, without regard to his locality.

Anything in a contract, that is contrary to the policy of

the law, may avoid.it. *Baun* vs. *Gay*, 1 East, 195. Lord
Ellenborough recognized the doctrine in several cases.
*Cole* vs. *Gower*, 6 East, 116. He said in one, "whenever
the toleration of any species of contract has a tendency to
produce a public mischief or inconvenience, such a con-
tract has been held to be void." *Gilbert* vs. *Sykes*, 16 East,
156; and in another, "the court will not give sanction to a
contract entered into against the policy of the law."
*Langton* vs. *Hughes*, 1 M. and S., 597. His successor, Lord
Tenterden, expressed the same views, "where a contract
which a plaintiff seeks to enforce, is expressly or by impli-
cation forbidden by the statute or common law, no court
will lend its assistance to give it effect." *Wetherell* vs. *Jones*,
3 Barn. & Adol., 225. The supreme court of New York
and the supreme court of the United States, have both sus-
tained the rule, that contracts which have for their object
anything repugnant to the general policy of the law, are
void. *Thallemer* vs. *Brenkerhoff*, 20 Johns., 397; *Bank of
U. S.* vs. *Owens*, 2 Peters, 538; 7 Wend., 280; Lord Cran-
worth's decision in *Egerton* vs. *Brownlow*, 1 Sim. N. S., 481;
40 English Ch. Rep.; 7 Eng. L. & Eq., 173, came before the
House of Lords in 1853. On this occasion, some of the
judges pointed out the danger of relying on general notions
of public expediency or policy. 4 House of Lords, 70, 77,
85. But in their opinions, the others did not concur.
Parke B., whilst objecting to the term "public policy" as
vague and unsatisfactory and calculated to lead to uncer-
tainty and error, when applied to the decisions of legal
rights, admitted that it "may indeed be used only in the
sense of the policy of the law, and in that sense, it forms a
just ground of judicial decision. It amounts to no more
than that a contract or condition is illegal, which is against
the principle of the established law." This doctrine, says
Justice Pollock, of the public good, or the public safety, or
what is sometimes called "public policy," being the foun-
dation of law, is supported by decisions in every branch of
the law; and an unlimited number of cases may be cited as
distinctly and directly deciding upon contracts, on the

avowed ground of the public good, and on that alone; and the name and authority of nearly all the great lawyers, (whose decisions and opinions have been extensively reported), will be found associated with this doctrine in some shape or other. Baron Pollock, 4 H. L., p. 144.

But this contract is not only repugnant to the policy, but violative of the recognized doctrines of the common law.

On full consideration, the king's bench, in 40, Geo. 3d, (1800), declared it a principle of the common law, that trading with the enemy without the king's license, was illegal in British subjects. *Potts* vs. *Bell*, 8 Term Rep., 561. Since this decision, say the court in *Fartedo* vs. *Rodgers*, 3 Bos. & Pul., 200, it has been generally understood that all commercial intercourse with the enemy was regarded as illegal at common law.

This doctrine is fully approved by Chief Justice Kent, in the case of *Griswold* vs. *Waddington*, 1 Johns., 483, in the following admirable remarks extracted from his opinion in that case:

"There is no authority in law, whether that law be national, maritime, or municipal, for any kind of private, voluntary, unlicensed business communication or intercourse with an enemy. It is all noxious, and in a greater or less degree, it is criminal. Every attempt at drawing distinctions has failed; all kinds of intercourse, except that which is hostile, is illegal. The law has put the sting of disability into every kind of voluntary communication and contract with an enemy, which is made without the special permission of the government. There is wisdom and policy, patriotism and safety in this principle, and every relaxation of it tends to corrupt the allegiance of the citizen, and to prolong the calamities of war."

3d. This contract is void, it being in violation of the act of Congress of the 13th of July, 1861, and the proclamation of President Lincoln, of the 16th of August, 1861.

The proclamation declares the State of Virginia, except the inhabitants of that part of the State lying west of the Alleghany mountains, and the inhabitants of such other parts of that State as may maintain a loyal adhesion to the Union and the Constitution, to be in a State of insurrection against the United States, and that all commercial intercourse between the said State of Virginia, with the exceptions aforesaid, and the citizens of the loyal States shall be unlawful. It also provides that all goods and chattles, wares and merchandise, coming from the State of Virginia, with the exceptions aforesaid, to any of the loyal States, or proceeding from the loyal States to the State of Virginia, with the exceptions aforesaid, shall be forfeited to the United States.

Now it is obvious wherever these exceptions are introduced—they are exceptions in favor of trade, in other words, they are parts of States left open for commercial intercourse with the loyal States of the North. There is not a word or syllable in the proclamation that authorizes or sanctions trade from any quarter with the recognized insurrectionary district. In his opinion it is a matter of not the slightest importance whether the county of Berkeley, from whence these goods were taken to Richmond, was a loyal or disloyal part of the State of Virginia, the letter and spirit of the proclamation was alike violated, in conveying these goods to Richmond, the heart and centre of the insurrection.

But suppose the construction which the counsel for the appellant gives to the proclamation were the sound one, and that the non intercourse law is only violated where goods are conveyed from a loyal locality to an insurrectionary district. Still, the evidence in the record, and the cotemporaneous history of the country show, that the county of Berkeley, throughout the whole of our civil commotions, maintained a loyal adhesion to the Union and Constitution, and consequently came within the exception, as the counsel construes it, of the President's proclamation. See evidence in the record; History of the formation of West Vir-

ginia, 1st West Virginia Reports, p. 52; President Lincoln's proclamation of December, 1862.

BROWN, President.   The first question to be determined in this case is whether it was competent to prove by ev.dence *in pais* that the county of Berkeley, or rather the people thereof, maintained a loyal adhesion to the Constitution and Union, and so were within one of the exceptions of the act of Congress of July 13th, 1861, and of the President's proclamation issued in pursuance thereof, August 16th, 1861, excepting certain portions of the State and people of Virginia from the operation thereof, by which the people of said State had been declared to be in a state of insurrection against the government and laws of the United States.

For the defendants it is insisted that it cannot be done, and that the status of any particular part of a State, whether in rebellion or not, is a matter to be determined by the President, under the act of Congress, and all territory not specifically described must be held to be in insurrection or rebellion, until the President, by some subsequent proclamation, declares that a part of it does "maintain a loyal adhesion to the Constitution and Union."   And that whether a particular place maintains a loyal adhesion or not is not a matter *in pais* to be decided by a jury.

It was not the purpose of the act of Congress, nor of the proclamation, to declare those parts of the State in insurrection which maintained a loyal adhesion to the Union, and, therefore, such parts were expressly excepted.   If Berkeley county, therefore, in fact, maintained a loyal adhesion to the Union, she was not declared in a state of insurrection.   How the fact is to be ascertained is not indicated in the proclamation, and must, therefore, in a judicial proceeding, be ascertained like every other fact, by the best evidence which the nature of the case admits of; and that has been done, and, evidently, to the satisfaction of the court and jury, by the testimony in the cause and the public

history of the country ; and I may add to the satisfaction also of this court.

And this mode of ascertaining the fact is believed to be consistent with the principles and policy enunciated in the case of *The Venice,* 2 Wallace, 259.

I think, therefore, that the legal status of the people of Berkeley, and the county territorially, was not changed by the proclamation from that of peace to one of insurrection and rebellion; nor could the fact that the court and officers in the county for a time acknowledged the authority of the rebels, and thereby forfeited the rightful authority, change the result.

Regarding then the status of Berkeley county as that of maintaining a loyal adhesion to the Constitution and the Union, the evidence further shows that, like many other loyal portions of the country not declared to be in a state of insurrection, as, for instance, nearly one-third of the counties of the State of West Virginia, the county of Berkeley was, at the time of the contract sued on, viz: on September 21, 1861, in fact overrun and in possession and military occupation thereof, actually held by the rebel armies, and the whole country from thence to Richmond in like condition.

Thus situated the plaintiffs sold goods to a party for whom the defendant became surety for the price of the goods to be taken from Berkeley to Richmond, and which were taken accordingly. And the inquiry now is, whether the transaction was unlawful. If there had been no actual occupation of the county by the rebel forces at the time, it would have been clearly so, and the character of the transaction would not have been changed unless it had been shown to have been the result of necessity; for while submission to the *vis major* would be excused, no purely voluntary act otherwise unlawful could be justified.

There is nothing in the case impugning the voluntary character of the sale in question, and nothing, therefore, to relieve it from the taint of of illegality or draw the sting of disability which the laws puts on every voluntary contract with an enemy.

Without feeling it necessary to review in this opinion the numerous authorities cited in the argument, suffice it to say, according to the evidence, the contract sued on falls under the ban of the act of Congress and the President's proclamation prohibiting trade with an enemy, as well as being against the policy of the common law.

I think, therefore, that there was no error in overruling the plaintiffs' motion for a new trial. And the judgment of the court below should be affirmed, with costs and damages to the defendant in error.

The other judges concurred.

JUDGMENT AFFIRMED.